**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| VICKIE WILLIAMS | CIVIL ACTION |
|---|---|
| v. | NO. 17-2413 |
| THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and BONITA BALL | |

Baylson, J.                                                                                    September 18, 2018

## MEMORANDUM RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this case, we must determine whether genuine disputes of material fact preclude summary judgment on behalf of Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System ("HUP"), The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital ("Pennsylvania Hospital"), and Bonita Ball. Plaintiff Vickie Williams initiated this suit alleging that Defendants violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Family and Medical Leave Act ("FMLA"), and related Pennsylvania statutes, by unlawfully terminating her employment as a Patient Care Technician at Pennsylvania Hospital.

For the reasons discussed below, summary judgment for Defendants is granted in full.

## I.   UNDISPUTED FACTS

The following is a fair account of the factual assertions at issue in this case, as taken from both parties' Statements of Fact and not genuinely disputed.

Plaintiff Vickie Williams was hired by Penn on January 20, 2009 as a Patient Care Technician ("PCT") and assigned to work on 6 Scheidt. ECF No. 28, Def.s' Mot. for Sum. Jmt.

("Def.s' Mot."), Def.s' Statement of Facts ("DSOF") ¶¶ 3-4. Penn hired Defendant Bonita Ball as a Nurse Manager on February 4, 2014. Id., DSOF ¶ 6. Ms. Ball served as Plaintiff's supervisor from early 2014 through the termination of Plaintiff's employment on March 29, 2016. Id., DSOF ¶ 7.

### A. Plaintiff's Disability and Approved Leave

On February 9, 2015, at 9:08 a.m. an email was sent to Defendant Ball indicating that Plaintiff was approved for Intermittent Family & Medical Leave for "Serious Health Condition—Self." Pl.'s Br. in Opposition to Def.s' Mot for Sum. Jmt. Exh. K. Specifically, Plaintiff was approved for two absences per month, between 9/30/2014 through 3/29/2015. Id. The email further indicated that Plaintiff had already used her intermittent leave on the following dates: 10/18/2014, 10/19/2014, 11/30/2014, 1/26/2015, and 1/27/2015. Id.

Ms. Ball testified that when an employee takes intermittent FMLA leave, managers "backfill" the schedule to cover the employee's shift. Pl.'s Br. at 15-16, Exh. R-6 of 6, Oct. 2, 2017 Deposition of Bonita Ball, at 154:23-155:4. She explained that "you never know when the employee's going to take [intermittent FMLA], that's why it's intermittent, they use as needed," and when asked "[d]id that frustrate you at all?" she responded: "No, it's my daily life as a manager. People are, you know, they're allowed to take intermittent FMLA." Pl.'s Br. Exh. R-6 of 6, Ball Deposition at 154:23-155:4.

On December 29, 2015, Plaintiff's physician wrote in a summary of Plaintiff's office visit that "[s]he is here to follow up elevated blood pressures at home and work…She has been distraught lately because her pregnant 19 year old daughter has disappeared…She would like some time off work to get herself together; she's concerned her work performance is not acceptable at present." Def.s' Mtn., DSOF ¶ 65; Pl.'s Response to DSOF ¶ 65; Def.s' Mtn. Exh.

V at 1.  Plaintiff applied for, and was granted, continuous FMLA leave beginning on December

29, 2015, which lasted through March, 2015.  Def.s' Mtn., DSOF ¶ 67; Pl.'s Response to DSOF

¶ 67; Def.s' Mtn. Exh. E, Feb. 1, 2018 Deposition of Vickie Williams at 117:8-17.

On January 19, 2016, Penn approved Plaintiff for "Other Medical Leave" for the period

between March 3, 2016 and March 16, 2016.  Def.s' Mtn. Exh. E, Williams-22; Def.s' Mtn. Exh.

E, Williams Deposition at 119:22-120:7.  Penn's "Other Medical Leave" policy provides: "An

eligible employee may request 'Other Medical Leave' when the ***employee***: 1) ***has a serious***

***health condition*** and is not eligible for FMLA leave and/or 2) needs additional time beyond an

approved FMLA leave for ***his or her own*** serious health condition.  Other Medical Leave ***can***

only be taken consecutively.  Thus Other Medical Leave can only be used once, in any duration,

for the same serious health condition."  Def.s' Mtn. Exh. W (emphasis in original).

### B.  Disciplinary Structures and Policy at Pennsylvania Hospital

Pennsylvania Hospital maintains a Performance Improvement and Progressive Steps

Policy ("Progressive Steps Policy") governing employee discipline, which Plaintiff was aware

of.  Def.s' Mot., DSOF ¶ 8; Pl.'s Response to DSOF ¶ 8; Def.s' Mtn. Exh. E, Williams

Deposition at 89:6-9.  Plaintiff is familiar with the Progressive Steps Policy, specifically the

policy effective as of May, 2015.  Pl.'s Response to DSOF, ¶¶ 8-11; Def.s' Mtn. Exh. E, Feb. 1,

2018 Vickie Williams Deposition at 89:18-90:3.  The Progressive Steps Policy that was effective

as of May, 2015, provides for "progressive steps for performance improvement" as follows: (1)

Coaching; (2) First Written Warning; (3) Second Written Warning; (4) Final Warning; and (5)

Termination of Employment.  Def.s' Mtn. Exh. E, Williams-10 at PAH 000535-PAH 000537.[1]

---

[1] While the Progressive Steps Policy paperwork that was shown to and identified by Plaintiff during her
deposition technically came into effect in May, 2015, the continuity of the documentation in evidence
predating May, 2015, and the language used by several witnesses in regards to the disciplinary policy at

Sarah Johnson, who worked in human resources with Penn in 2015, testified that issuance of disciplinary write-ups is within the discretion of supervisors, in accordance with the Progressive Steps Policy. Pl.'s Br. Exh. V-3 of 3, Feb. 9, 2018 Deposition of Hannah Lacko at 50:4-17; Pl.'s Br. Exh. V-3 of 3, February 9, 2018 Deposition of Sarah Johnson at 50:19-51:16. Angel McCollough likewise testified that managers have discretion in the disciplinary process, noting that Defendant Ball in some cases of employee misconduct chose to take the less serious action of issuing a "note to file" rather than "progressing [the employee] to the next step of discipline" when she "deemed that an event was not worthy of being written up." Pl.'s Br., Exh. P-2 of 2, Oct. 2, 2017 Deposition of Angel McCullough at 75:7-76:16.

Plaintiff's former manager Christopher Huot testified as follows, when asked to describe "the progressive disciplinary policy at Penn": "the progressive steps essentially are, you start with a coaching, then you'd go to a first written warning, a second written warning, a final written warning, and then termination is the progression." Pl.'s Br. Exh. G-3 of 4, Feb. 2, 2018, Deposition of Christopher Huot at 108:6-14. He further testified that his understanding of the progressive steps policy includes "that the discipline builds on itself along the progressive steps regardless of what the discipline is for," "[s]o you could have a coaching for one thing and then a first written warning for something completely unrelated," and that "the discipline says [sic] with you for…12 months," and "once you get passed [sic] 12 months, you essentially have a clean slate." Pl.'s Br. Exh. G-3 of 4, Huot Deposition at 109:9-11, 109:13-15; 117:16-18, 117:20-21. Defendant Ball similarly described the investigation process underlying the progressive disciplinary policy as being individualized based on the type of misconduct, and explained that

---

Pennsylvania Hospital, makes clear that the same policy was in place throughout Plaintiff's time working for Defendants. There is no genuine issue of fact on this point.

the manager is usually in charge of the investigation and dictates how it is carried out. Pl.'s Br. Exh. F-5 of 14, Ball Deposition at 147:16-148:9.

SafetyNet is a reporting system internal to the Penn system, where a wide variety of incidents can be reported, and can be done so anonymously. Pl.'s Br. Exh. V-3 of 3, Johnson Deposition at 32:20-33:6; Pl.'s Br. Exh. F-3 of 14, Ball Deposition at 109: 10-15. Leonard Umile, who was in the Penn Human Resources Department around the time of the events in question, described the "SafetyNet" system as "a database where employees input untoward outcomes to patients or untoward interactions with each other, report untoward outcomes to patients or negative interactions that occur among staff," and which accepts anonymous reporting of such incidents. Def.s' Mtn. Exh. S, Feb. 2, 2018 Deposition of Leonard Umile at 46:1-11.

## C. Plaintiff's Performance Reviews and Disciplinary Record Prior to 2015

Mr. Huot testified that the Performance Appraisal rankings range from a score of "1-4," and that a score of "2" reflects "the bear [sic] minimum," while a score of "3" reflects "average to above average." Pl.'s Br. at 7, Exh. H-1 of 2, Huot Deposition at 142:23-143:2.

On April 28, 2010, Christopher Huot conducted Plaintiff's Performance Appraisal and she received an overall score of "3.0" which reflected a rating of "3.18" in the "Patient/Customer" area, a "3" in the "Operations" area, and a "3" in the "Core Values" area. Def.s' Mtn. Exh. E, Williams-4.

On Plaintiff's April 25, 2011 Performance Appraisal, Mr. Huot assigned Plaintiff an overall score of "2.94" which reflected a rating of "2.8" in the "Patient/Customer" area, a "3.0" in the "Operations" area, and a "3.0" in the "Core Values" area. Def.s' Mtn. Exh. E, Williams-5

On Plaintiff's April 13, 2012 Performance Appraisal, Mr. Huot assigned Plaintiff an overall score of "2.8" which reflected a rating of "2.8" in the "Patient/Customer" area, a "3.0" in the "Operations" area, and a "2.8" in the "Core Values" area. Def.s' Mtn. Exh. E, Williams-6.

On July 11, 2013 a Clinical Nurse named Lisa O'Neill issued a Performance Appraisal of Plaintiff, assigning her an overall score of "2.9" which reflected a rating of "2.8" in the "Patient/Customer" area, a "3.0" in the "Operations" area, and a "2.9" in the "Core Values" area. Pl.'s Br. Exh. "H to H2."

On October 23, 2015 Defendant Ball issued a Performance Appraisal of Plaintiff, assigning her an overall score of "2.27" which reflected a rating of "2.6" in the "Patient/Customer" area, a "2.0" in the "Operations" area, and a "2.3" in the "Core Values" area. Def.s' Mtn. Exh. E, Williams-9.

Plaintiff received two separate "Coaching" disciplinary write-ups from manager Christopher Huot while working under him, one in 2009 and one in 2010. Def.s' Mtn., DSOF ¶ 18; Pl.'s Response to DSOF, ¶ 18; Def.s' Mtn. Exh. E, Williams-12 and Williams-13.

On Plaintiff's April 28, 2010 Performance Appraisal her then-manager Mr. Huot noted that "Vickie will work on maintain[ing] positive relationships with both patients and coworkers, even when she is having a bad day." Def.s' Mtn., DSOF ¶ 19; Pl.'s Response to DSOF, ¶ 19; Def.s' Mtn. Exh. E, Williams-4.

On Plaintiff's April 25, 2011 Performance Evaluation her then-manager Mr. Huot noted that he "would challenge Vickie to be mindful of the attitude that she has on the unit on days she doesn't feel her best, ensuring that her tone and conversations are always appropriate and professional." Def.s' Mtn., DSOF ¶ 20; Pl.'s Response to DSOF ¶ 20; Def.s' Mtn. Exh. E, Williams-5. On Plaintiff's April 13, 2012 Performance Evaluation, her then-manager Mr. Huot

noted that "Vickie will take note of the way her attitude and mood is perceived by the patients and her co-workers." Def.s' Mtn., DSOF ¶ 21; Pl.'s Response to DSOF ¶ 21; Def.s' Mtn. Exh. E, Williams-6. Plaintiff received two "Coaching" write-ups in 2012; one on August 16, 2012 for wearing improper attire, and one on September 4, 2012, for wearing artificial nails. Def.s' Mtn., DSOF ¶ 22; Pl.'s Response to DSOF ¶ 22; Def.s' Mtn. Exh. E, Williams-14.

Plaintiff's file indicates two occasions, on October 2, 2012 and August 29, 2013, on which she was counseled regarding her interactions with patients in response to negative patient feedback. Def.s' Mtn. Exh. F.[2]

On October 24, 2013, Plaintiff was issued a First Written Warning in response to a complaint from a patient's wife that the patient did not receive adequate care and consideration while under continuous observation by Plaintiff. Def.s' Mtn., DSOF ¶ 25; Pl.'s Response to DSOF ¶ 25; Def.s' Mtn. Exh. E, Williams-16. On January 8, 2014, Plaintiff was issued a Second Written Warning in response to five attendance (lateness) occurrences. Def.s' Mtn., DSOF ¶ 26; Pl.'s Response to DSOF ¶ 26; Def.s' Mtn. Exh. E, Williams-17.

**D. Plaintiff's Disciplinary Record Throughout 2015**

On February 9, 2015, Plaintiff received a "Coaching" under the Progressive Steps Policy which stated that on January 20, 2015, she "[failed to] properly follow the patient identification process in obtaining a blood sugar (point of care testing) on [a] patient"; the Coaching further stated "any further deviation will lead to further progressive steps in the discipline process beginning immediately." Def.s' Mtn., DSOF ¶ 28; Pl.'s Response to DSOF ¶ 28; Def.s' Mtn. Exh. E, Williams-18; Exh. E, Williams Deposition at 105:22-106:24.

---

[2] Plaintiff objects to any reference to or reliance on the document included in Exhibit F to Defendants' Motion for Summary Judgment—the "2012-2013 Disciplinary Notes to File"—on the grounds that it contains hearsay and on the grounds that Defendants failed to establish the authenticity of this unsigned document. This Court is unpersuaded on this point.

Angel McCullough—Defendant Ball's supervisor—testified in her deposition that "[t]he laboratory conducted the investigation [related to the January 20, 2015 incident] and Bonita Ball did follow-up with the conversation with Vickie." Def.s' Mtn. Exh. G, McCullough Deposition at 32:3-9; 68:17-69:3.

Defendant Ball submitted a note to Plaintiff's file on March 5, 2015 stating that Defendant Ball spoke with Plaintiff regarding three issues, including "frequent…breaks," "[c]ongregating in the hallway with other staff involving personal conversation," and "[p]ersonal phone calls or loud conversations at the desk"; the note further stated that Plaintiff "was informed this [was] an informal verbal warning," but that "any further observations of the above or unprofessional conduct will lead to formal disciplinary process," and that Plaintiff "expressed understanding of above." Def.s' Mtn. Exh. K.[3]

On March 30, 2015, Plaintiff received a "First Written Warning," as part of the Progressive Steps Policy, which stated that on March 23, 2015, a patient complained about Plaintiff's care, specifically, that on March 21, 2015 the patient informed Plaintiff that she had to go to the bathroom and that Plaintiff responded that she had to take the patient's blood pressure and input it into the computer, and while waiting for Plaintiff to do these things the patient "wet herself"; additionally the patient complained that she overheard Plaintiff speaking with another employee questioning the ability of the patient's aide to care for her needs. Def.s' Mtn. Exh. E, Williams-19; Exh. E, Williams Deposition at 107:9-20.[4]

_____

[3] Defendant Ball testified during her deposition to having personally observed the conduct which she described in her March 5, 2015 note to Plaintiff's file. Def.s' Mtn. Exh. L, Ball Deposition at 108:4-22. Plaintiff challenges Defendants' claim that the letter to file serves as corroboration of Defendant Ball's testimony to this effect.

[4] Plaintiff denies that Defendant Ball was acting in accordance with the applicable Progressive Steps Policy in filing this "First Written Warning." She does not, however, identify any evidence in support of this position. The "First Written Warning" document states "Documentation of Progressive Step for Performance Improvement," and the continued use of "Progressive Step" language throughout the

The "First Written Warning" stated "[o]n February 9, 2015, you received a coaching secondary to a deviation in a PAH policy and procedure. This negative approach in customer service has led to progression in the disciplinary process to a First Written Warning," and noted that "[a]ny further deviation will lead to further progressive steps in the disciplinary process." Def.s' Mtn. Exh. E, Williams-19.

In April, 2015, Plaintiff attended a class called "Crucial Conversations," after which she communicated what she learned during the class in an email to her supervisor, Defendant Ball. Def.s' Mtn., DSOF ¶ 40; Pl.'s Response to DSOF, ¶ 40; Def.s' Mtn. Exh. N; Def.s' Mtn. Exh. L, Ball Deposition at 120:14-121:21.

On October 23, 2015, Defendant Ball gave Plaintiff a Performance Evaluation Score of "2.27," the lowest score she received during her career at Penn. Def.s' Mtn. Exh. E, Williams-9; Def.s' Mtn. Exh. E, Williams Deposition at 85:14-86:6; Def.s' Mtn. Exh. O.

On November 30, 2015, Plaintiff received a "Second Written Warning," which states that on November 19, 2015, an RN requested Plaintiff's assistance with a particular patient's care, and that the RN reported that Plaintiff responded with an uncooperative and unprofessional attitude, as well as that the RN observed Plaintiff using her phone and internet for personal business during her shift. Def.s' Mtn. Exh. E, Williams-20; Def.s' Mtn. Exh. E, Williams Deposition at 109:3-19:6. The Second Written Warning also stated "[a]ny further deviation in care or customer service will lead to progressive disciplinary action. It is the expectation that you will display an attitude of professionalism, courtesy and respect for patients and peers, exhibiting a relationship-based care model." Def.s' Mtn. Exh. E, Williams-20.

---

document further establishes that this document is in fact part of the Progressive Steps Policy that was in place at the time.

On December 11, 2015, Mr. Huot sent an email to Defendant Ball stating that he learned from nursing staff that a patient had expressed concern about his care from Plaintiff the day prior, specifically that she was rough with him and turned on his TV while washing him, but that when Mr. Huot visited with the patient the patient expressed to him "that this was all just a silly interaction and that he [didn't] want anyone to get into trouble." Def.s' Mtn. Exh. P; Def.s' Mtn. Exh. Q. Plaintiff received a "Final Written Warning," dated December 23, 2015, which references the email from Mr. Huot, and states that Defendant Ball was informed of a patient's dissatisfaction with his interaction with Plaintiff during his AM care. Def.s' Mtn. Exh. E, Williams-21; Def.s' Mtn. Exh. E, Williams Deposition at 112:10-113:9. The Final Written Warning further states "[a]ny further deviation in care or customer service will lead to disciplinary action including termination. It is the expectation that you will display an attitude of professionalism, courtesy and respect for patients and peers, exhibiting a relationship-based care model." Def.s' Mtn. Exh. E, Williams-21.

Throughout 2015 Hannah Lacko worked as a Senior Improvement Advisor in Penn's Quality Services Department, and in that capacity she received copies of every SafetyNet entry filed within the departments she oversaw. Def.s' Mtn. Exh. T, Feb. 9, 2018 Deposition of Hannah Lacko at 9:7-23; 19:23-20:19. She received a copy of SafetyNet entry 81086, which was an anonymous complaint regarding Plaintiff, and shared the content of that complaint in an email to Leonard Umile on December 28, 2015:

> When answering a call bell to get a patient onto a commode, pt says that she felt mistreated one day this week which was unusual because all other care up to that point was exceptional. Patient said employee was demanding of her and had an attitude with her from the start of the day. Patient was not feeling well that day and was not ready to get out of bed yet employee showed no compassion or patience when she needed it most.

Def.s' Mtn. Exh. U.

Defendant Ball wrote an entry on December 21, 2015 in a letter to Plaintiff's file indicating that she met with the patient associated with the complaint detailed in Safety Net Entry 81086, and the patient's sons, "in follow up to employee complaint." Def.s' Mtn. Exh. R at PAH-000329. Defendant Ball wrote in the Letter to File that the patient indicated that the PCT "took her to the BR and left her in there to get washed, despite patient requesting to use bedpan," and that the PCT "had an attitude and was not nice." Id. In the Letter to File Defendant Ball also wrote that she spoke with Megan Brzozowski and Nicole Lazos regarding SafetyNet Entry 81086, and wrote a summary of "their account of the event," which included details regarding a conversation they had with a patient who indicated that she felt mistreated by a PCT who took her to the bathroom despite her request to use a bedpan. Id. Defendant Ball wrote on December 28, 2015 in the Letter to File that she "spoke to employee 'Vickie' regarding follow up on safety net# [number omitted in original]," and she wrote a summary of Vickie's account of the incident, which included reference to a conversation with an RN named Heather. Id. at PAD-000328. Defendant Ball wrote on December 29, 2015 in the Letter to File that she "[s]poke with Heather," and included a summary of Heather's comments on this incident— which indicated that the patient had been in a down mood on the day of the incident—as well as that Defendant Ball "[r]evisited patient" and again discussed the complaint. Id. at PAH-000327.

### E. Termination of Plaintiff's Employment

Towards the end of Plaintiff's FMLA leave period, Defendant Ball communicated with Plaintiff via text message regarding her shift availability. They exchanged the following text messages:

March 2, 2016:

> *Defendant Ball*: Good afternoon Vickie / Please tell me what day u r returning to work / FMLA indicates this week / Thanks Bonita

March 17, 2016:

> *Defendant Ball*: Received ur message will put u in schedule for 8/28 and we will look shift needs for the remainder of the week then / Bonita
>
> *Plaintiff*: Ok
>
> *Defendant Ball*: I meant 5/28 March / Ty

March 24, 2016

> *Defendant Ball*: Vickie I placed u on schedule Mon Tues and Thursday / Unsure when was ur weekend / C u Monday Bonita
>
> *Plaintiff*: Ok that's fine,, wkend is nxt mth..thank u..

Def.s' Mtn., DSOF ¶¶ 71-72; Pl.'s Response to DSOF, ¶¶ 71-72; Def.s' Mtn. Exh. E, Williams-26, Williams Deposition at 138:21-139:9.

Plaintiff was certified to return to work "without restrictions" effective March 28, 2016, by physician Tamara Danilewitz. Def.s' Mtn. Exh. E, Williams-24, Williams Deposition at 122:22-123:8. On March 28, 2016, Defendant Ball and Plaintiff had the following text message exchange:

> *Defendant Ball*: Vickie I was unsure if u were coming back to Pav this afternoon I need to see u before I go I will be leaving around 430 today
>
> *Plaintiff*: Noo they told me to stay
>
> *Defendant Ball*: Please ask is someone able to cover u for 15 min / To speak with ur Manager before 430 / Ty
>
> *Plaintiff*: Ok

Def.s' Mtn. Exh. E, Williams-26.

Plaintiff met with Defendant Ball on March 29, 2016, the day her employment with Penn was terminated. Def.s' Mtn. Exh. E, Williams Deposition at 127:1-3. Plaintiff received a letter dated March 29, 2016 indicating that her employment with Pennsylvania Hospital was being terminated "in accordance with the UPHS Performance Improvement and Progressive Steps Policy," and referencing "a progressive disciplinary history" made up of five incidents which occurred between February, 2015 and December, 2015. Def.s' Mtn. Exh. E, Williams-25; Exh. E, Williams Deposition at 126:3-14. At her deposition, when asked if anybody at Penn ever made any derogatory or negative remarks to her about her "conditions" or disabilities, Plaintiff responded, "[n]ot to me" and "no." Def.s' Mtn. Exh. E, Williams Deposition at 137: 14-138:13.

## II.  PROCEDURAL BACKGROUND

Plaintiff Vickie Williams filed her Complaint in this Court on May 26, 2017 (ECF 1) alleging nine counts:

I.  Discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 – against Defendants HUP and Pennsylvania Hospital

II.  Retaliation under the ADA, 42 U.S.C. § 12203 – against Defendants HUP and Pennsylvania Hospital

III.  Retaliation and Interference under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615 – against all Defendants

IV.  Discrimination under the Pennsylvania Human Relations Act, 43 P.S. § 955, ("PHRA")— against all Defendants

V.  Retaliation under the PHRA, 43 P.S. § 955(d) – against all Defendants

VI.  Aiding and Abetting under the PHRA, 43 P.S. § 955(e) – against all Defendants

VII.    Discrimination under the Philadelphia Fair Practices Ordinance ("PFPO"), P.C. § 9-
        1103(1) – against all Defendants

VIII.   Retaliation under the Philadelphia Fair Practices Ordinance, P.C. § 9-1103(1)(g) – against
        all Defendants

IX.     Aiding and Abetting under the Philadelphia Fair Practices Ordinance Sec, P.C. §9-
        1103(1)(h) – against all Defendants

Defendants Pennsylvania Hospital and Bonita Ball filed an Answer to the Complaint

along with Affirmative Defenses on July 12, 2017 (ECF 2).  Plaintiff filed a Motion to Compel

on April 10, 2018 (ECF 19), and the Court held oral argument on April 24, 2018 to address

discovery disputes.  Defendants filed a Motion for Summary Judgment on May 29, 2018 (ECF

28).  Plaintiff responded in opposition to Defendants' Motion for Summary Judgment on June

20, 2018 (ECF 31), and Defendants replied on June 26, 2018 (ECF 40).

## III.  LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show

"that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of

the suit under the governing law."  Id.

A party seeking summary judgment always bears the initial responsibility for informing

the district court of the basis for its motion and identifying those portions of the record that it

believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular

issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A). "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009)). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## IV. DISCUSSION

### A. Counts I, IV, and VII: Discrimination Claims

Counts I, IV, and VII all allege discrimination, under different frameworks—Count I alleges discrimination under the ADA, Count IV alleges discrimination under the PHRA, and Count VII alleges discrimination under the PFPO.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to…the hiring, advancement, or discharge of employees…" 42 U.S.C. § 12112(a). The PHRA makes it unlawful "[f]or any employer because of the…non-job related handicap or disability…to discharge from employment such individual…if the individual…is the best able and most competent to perform the services required." 43 P.S. § 955(a). The PFPO

makes it unlawful "to deny or interfere with the employment opportunities of an individual based upon his or her…disability," including hiring and firing decisions.  P.C. § 9-1103(1)

All three of Plaintiff's discrimination claims are subject to the three-part burden-shifting framework set out in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973) and can be analyzed together.  See, Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999) (PHRA discrimination claims are subject to same analysis as ADA discrimination claims); Joseph v. Continental Airlines, Inc., 126 F.Supp.2d 373 (E.D. Pa. Dec. 19, 2000) (PFPO claims are analyzed under the McDonnell Douglas framework).  A plaintiff faces the initial burden of establishing a prima facie case of unlawful discrimination.  McDonnell Douglas, 411 U.S. at 802.  If a prima facie case is successfully established, the Defendant then must articulate some legitimate, nondiscriminatory reason for the Plaintiff's adverse treatment.  Id. at 802-803. Finally, if the defendant successfully puts forth such reasons, the plaintiff must demonstrate that those reasons are merely a pretext for unlawful employment discrimination.  Id. at 804-805.

To make out a prima facie case under the ADA, an employee must establish that she "(1) has a disability; (2) is a qualified individual; and (3) has suffered an adverse employment action because of that disability."  Deane v. Pocono Medical Center, 142 F.3d 138, 142 (3d Cir. 1998) (citing Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.).

Defendants argue that Plaintiff has failed to establish the second prong of her prima facie ADA claim because the record demonstrates that Plaintiff was not qualified to work as a PCT at Penn.  Def.s' Br. in Support of their Mot. for Sum. Jmt. at 7-8.  Defendants argue that Plaintiff's deficient performance was documented over the course of her employment with Penn, and worsened in 2015.  Id. at 8.  Plaintiff responds that the record establishes that her performance as a PCT with Penn prior to Defendant Ball's arrival was consistently above-average, as

demonstrated by her Performance Appraisals from 2010 through 2014.  Pl.'s Br. in Opposition to

Def.s' Mtn. for Sum. Jmt. at 7, 10.[5]  Plaintiff adds that the record demonstrates that the

implementation of the Progressive Steps Policy is discretionary, that SafetyNet Complaints are

often submitted anonymously, and that Defendant Ball's investigations into Plaintiff's

disciplinary issues were insufficient.  Id. at 8-9.  Plaintiff argues that this evidence creates a

genuine question as to whether she was qualified to be employed as a Patient Care Technician,

and would permit a reasonable jury to conclude that she was so qualified.  Id. at 6.

　　　In evaluating whether a plaintiff is a "qualified individual," such that she is entitled to the

protections of the ADA, "[f]irst, a court must determine whether the individual satisfies the

requisite skill, experience, education and other job-related requirements of the employment

position that such individual holds or desires.  Second, it must determine whether the individual,

with or without reasonable accommodation, can perform the essential functions of the position

held or sought."  Deane, 142 F.3d at 145 (internal citations omitted).  The second piece of this

inquiry is broken down into two parts: "First, a court must consider whether the individual can

perform the essential functions of the job without accommodation.  If so the individual is

qualified…If not, then a court must look to whether the individual can perform the essential

functions of the job with a reasonable accommodation.  If so, the individual is qualified.  If not,

the individual has failed to set out a necessary element of the prima facie case."  Id. at 146.

　　　We agree with Plaintiff that based on the record evidence, a reasonable jury could

determine that Plaintiff was a "qualified individual" in that she satisfies the requirements

necessary to work as a PCT, and she can perform the essential functions of the position.  There is

ample evidence that Plaintiff performed the job of PCT with Penn for over five years, over the

---

[5] Plaintiff failed to include page numbers in her Brief in Opposition to Defendant's Motion for Summary
Judgment, thus this opinion refers to the ECF page numbers.

course of which she regularly received decent performance reviews indicating that she was

sufficiently completing the basic functions of her job. This Court is unpersuaded by Defendants'

argument that the occasional disciplinary write-ups Plaintiff received prior to 2015 indicate that

she was not qualified. Plaintiff faced disciplinary action largely as a result of her attitude, mood,

and conversational tone. These incidents are not clearly related to her "skill, experience,

education" or ability to "perform the essential functions of the job." In fact, there is no specific

evidence in the record that Plaintiff lacked the requisite skill, experience, or education to work as

a PCT, or that she was unable to perform the essential functions of the job. Over the course of

her employment Plaintiff apparently received only one write-up that was directly related to her

*ability* to perform her job functions, and that came some five years in, when on February 9, 2015,

she received a write-up for failure to follow the patient identification process when conducting a

blood sugar test on a patient. Evidence of one deviation from proper procedure is an insufficient

basis on which to conclude that Plaintiff was unqualified to perform the essential functions of her

job. Patient complaints about unpleasant interactions with Plaintiff are likewise an insufficient

basis on which to draw this conclusion—at most these complaints indicate poor performance by

Plaintiff, however, not an *inability* to perform the essential functions of her job or a lack of skill

or qualifications.

Moving to the third prong of Plaintiff's prima facie case, Defendants argue that there is

no evidence that Plaintiff's employment was terminated *because of* a disability; Defendant Ball

denies having knowledge of Plaintiff's alleged disability, and Plaintiff testified that no one at

Penn made derogatory or negative comments about her alleged disability. Def.'s Br. at 9, Exh.

E, Williams Deposition at 26:23-27:13; Exh. L, Ball Deposition at 125: 17-20. To the contrary,

Defendants argue the record clearly establishes that Plaintiff was terminated from her position

with Penn as the result of a series of disciplinary infractions.  Def.s' Br. at 9-10.  Plaintiff responds that on the record evidence a reasonable jury could find that she was discriminated against because of her disabilities; she highlights an email sent to Defendant Ball on the morning of February 9, 2015, the same day that Defendant received a disciplinary write-up, which indicated approval for Plaintiff to take Intermittent FMLA leave.  Pl.'s Br. at 11, Exh. K.  She also points to Defendant Ball's testimony regarding the need to schedule coverage for an employee taking Intermittent FMLA leave via "backfill," due to a lack of advance notification about when that employee would be out.  Pl.'s Br. at 15-16.

In order to establish that Plaintiff was fired *because of* her disability, she must demonstrate that the decision maker, Defendant Ball, was aware of her disability.  Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002).  Defendant Ball testified that she had no knowledge of Plaintiff's alleged disability, however, an email was sent directly to Defendant Ball on February 9, 2015, at 9:08 a.m., which indicated that Plaintiff was approved for Intermittent Family & Medical Leave for "Serious Health Condition—Self."  Pl.'s Br. Exh. K.  While the email did not provide any details to clarify what type of "serious health condition" Plaintiff was suffering from, a reasonable juror could conclude that the information that was provided would have been adequate to alert Defendant Ball to the fact that Plaintiff suffered from a disability.

There is no clear, direct evidence, however, that this knowledge motivated her to take disciplinary action against Plaintiff or ultimately terminate her employment.  Plaintiff was subject to a series of disciplinary write-ups over the course of 2015, ultimately culminating in her firing pursuant to the clearly articulated progressive disciplinary regime in place at Pennsylvania Hospital, known as the Progressive Steps Policy.  Plaintiff challenges the legitimacy of the

disciplinary actions taken against her as having been unsubstantiated, and urges that her defense of herself in regard to the incidents underlying these write-ups was ignored. There is evidence of an investigation being conducted into the "Coaching" Plaintiff received in February, 2015—the first in the series of write-ups leading up to the termination of her employment—and there is evidence of an investigation being conducted into the final incident that triggered Plaintiff's firing, which occurred in December, 2015. Questions of fact do remain as to whether investigation was conducted to substantiate the other incidents. Furthermore, prior to transitioning to work under the management of Defendant Ball, Plaintiff consistently received decent performance appraisals from manager Christopher Huot, despite his taking note of some issues with her attitude, suggesting that she performed her job well for several years. Ultimately, taking the evidence in the light most favorable to Plaintiff as the non-moving party here, it is not absolutely clear that no reasonable jury could infer that Plaintiff was fired because of her disability.

Even assuming that a reasonable jury could conclude that Plaintiff has established a prima facie employment discrimination case, though, summary judgment in favor of Defendants is nevertheless appropriate on these claims. Turning to the second prong of the <u>McDonnell Douglas</u> analysis, the record undoubtedly sustains Defendants' assertion that there were legitimate, nondiscriminatory reasons for their decision to terminate Plaintiff's employment. Over the course of 2015 Plaintiff received disciplinary write-ups in a progressive manner as laid out under the Progressive Steps Policy, within the allotted one-year period, resulting in the termination of her employment. Plaintiff was disciplined on the basis of patient-initiated complaints several times. Each time she was informed that any further deviation in care or customer service would lead to her facing further discipline. Defendants have successfully

articulated legitimate, nondiscriminatory reasons for terminating Plaintiff's employment,

satisfying their burden under the second prong of the <u>McDonnell Douglas</u> analysis.

Plaintiff is unable to salvage her discrimination claims as we turn to the final prong.

Once a defendant has satisfied its burden to establish a legitimate, nondiscriminatory reason for

the employment decision at issue, "the burden of production shifts back to the plaintiff to proffer

evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more

likely than not a motivating or determinative cause of the employer's action.'" <u>Showalter v.</u>

<u>University of Pittsburgh Medical Center</u>, 190 F.3d 231, 235 (3d Cir. 1999) (<u>quoting</u> <u>Fuentes v.</u>

<u>Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994)).[6]

As an initial matter, Plaintiff's briefing is limited to her prima facie case and fails to even

present a coherent argument that Defendants' stated legitimate, nondiscriminatory reasons for

firing her are in fact a pretext and should be disbelieved. An affirmative showing that an

---

[6] Notably, the Third Circuit recognizes "two types of disparate employment discrimination actions—
'pretext' and 'mixed-motive'—and [ ] applie[s] different standards of causation depending on the type of
case plaintiff presented." <u>Watson v. Southeastern Pennsylvania Transp. Authority</u>, 207 F.3d 207, 214 (3d
Cir. 2000). To be successful on a pretext claim a plaintiff must prove the improper consideration was "a
determinative factor" in the employment action; on the other hand, when pursuing a "mixed-motive"
theory, a plaintiff need only show that the unlawful motive was a "substantial motivating factor." <u>Id.</u> at
215. Plaintiff has failed to clearly identify which theoretical framework she intended to pursue her claims
under, as her argument is focused almost exclusively on her prima facie case for each cause of action, but
based on the few available clues she has provided it appears that Plaintiff is advancing a pretext theory.
She refers to Defendant Ball's actions as constituting a "pretextual campaign to terminate" her
employment, and she makes no mention of the concepts of "mixed-motives" or "substantial motivating
factor." Our analysis thus proceeds as though Plaintiff has asserted a theory of pretext. Importantly
though, Plaintiff's discrimination claims would fare no better under a "mixed-motive" theory, as the
evidence comes no closer to establishing that Defendants were substantially motivated to fire Plaintiff due
to her disability, than it does to establishing that Plaintiff's disability was a determinative factor in their
decision. The record is devoid of affirmative evidence that Defendants acted with a discriminatory intent;
our determination that Plaintiff could possibly establish a prima facie case of employment discrimination
depends instead on charitable inferences from Plaintiff's performance in the PCT role over time and
incomplete evidence about the sufficiency of investigation into Plaintiff's disciplinary issues. Thus the
evidence does not directly support a theory that Defendants actively considered Plaintiff's disability in
reaching the decision to terminate her employment, and on this record Plaintiff cannot prove any level of
discriminatory intent on Defendants' part.

employer's claimed legitimate reasons are pretextual is not necessary, however, to satisfy this burden, so this failure alone does not preclude a finding in her favor. Rather, at this stage of the analysis this Court simply must determine whether a reasonable juror could conclude that Defendants' decision to terminate Plaintiff's employment was motivated by discrimination. The Supreme Court has explained:

> The defendant's production [of legitimate, nondiscriminatory reasons for the relevant employment decision]…having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against him…The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and…upon such rejection, no additional proof of discrimination is *required*.

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993) (emphasis in original) (internal quotations, citations, and modifications omitted). Thus, even though Plaintiff has not presented additional evidence or a clear argument regarding pretext, we nevertheless move now to the ultimate issue—"which party's explanation of the employer's motivation [we] believe[]." Id., 509 U.S. at 519 (quoting Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715-16 (1983)) (internal modifications omitted). In pursuit of this task we review the record "for evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons." Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995) (internal quotations and citations omitted).

There is simply no basis in the record on which to conclude that Defendants' explanation of their motivation for firing Plaintiff is false. Plaintiff attacks the legitimacy of the Progressive Steps Policy as "discretionary" and inconsistently applied. While the record indeed establishes that Defendant Ball had discretion in implementing discipline, there is no evidence that she

approached this task in an unfair or inconsistent manner.  The progression of disciplinary action

at Pennsylvania Hospital was clear cut under the policy; the fact that individual managers,

including Defendant Ball, were permitted discretion to investigate and handle disciplinary

matters as they saw fit does not undermine the validity of the policy.  Moreover, Defendant Ball

exercised her discretion *in Plaintiff's favor* on at least one occasion by choosing not to issue a

formal disciplinary write-up following an incident in March, 2015, and instead writing an

informal note in Plaintiff's file.  Moreover, Defendant Ball apparently attempted to assist

Plaintiff in improving her patient care performance by communicating with her in regard to an

instructive class called Crucial Conversations that Plaintiff attended.  Plaintiff received a series

of disciplinary write-ups over the course of 2015, which escalated appropriately according to the

clearly established Progressive Steps Policy and within the year-long limitations period set out

by the policy.  There is no evidence to counter the narrative set forth in these write-ups.

   All of Plaintiff's attempts to manipulate the facts in order to undermine the legitimacy of

the disciplinary action that she faced ring hollow.  First, the fact that complaints could be filed

anonymously through SafetyNet does not, as Plaintiff contends, undermine the validity of

Defendants' disciplinary policy.  The one disciplinary action taken against Plaintiff in response

to an anonymous SafetyNet complaint was investigated over the course of several days by

Defendant Ball, who spoke with the patient involved, other staff members who had information

about the incident, and Plaintiff herself, to develop a thorough account of the incident from

multiple perspectives before taking disciplinary action.  Second, contrary to Plaintiff's assertion,

Defendant Ball did not make negative or frustrated comments about the need to "backfill"

coverage for employees using intermittent leave.  To the contrary, she simply explained that this

type of coverage had to be arranged without advance notice and that this was part of her job as a

manager. Third, Plaintiff offers no basis whatsoever in support of her argument that because Defendant Ball's supervisor Angel McCullough did not conduct her own independent investigation of disciplinary complaints against Plaintiff, the resulting disciplinary actions were invalid. Finally, Plaintiff's assertion that Ms. McCullough admitted that in some instances Defendant Ball did not speak to any witnesses when investigating complaints is not supported by the evidence that Plaintiff identifies for this proposition, nor is it supported by the bulk of the record.

Plaintiff's vague objections to the disciplinary process in general, and to the disciplinary write-ups she received in particular, are not supported by any objective evidence, in the form of witness accounts or otherwise. Plaintiff fails to even offer a *description of* claimed inaccuracies in the write-ups she received. There is simply nothing in the record that genuinely calls into question the stated reasons for Plaintiff's firing, which are on their face entirely legitimate. On this record no jury could conclude that Defendants acted out of a discriminatory motivation in terminating Plaintiff's employment. The Court will enter summary judgment in Defendants' favor on Counts I, IV, and VII.

## B. Counts II, V, and VIII: Retaliation Claims

Counts II, V, and VIII all allege retaliation, under different frameworks—Count II alleges retaliation under the ADA, Count III alleges retaliation under the FMLA, Count V alleges retaliation under the PHRA, and Count VIII alleges retaliation under the PFPO.

It is unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a). As with the discrimination claims, all of the retaliation claims are appropriately subject to the same evaluation.

A claim alleging retaliation for protected ADA activity is subject to the same <u>McDonnell Douglas</u> burden shifting analysis as a discrimination claim: a plaintiff must first establish a prima facie case by showing: "'(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'  If the plaintiff is able to establish these elements of his/her prima facie case, 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action.'  If the employer satisfies that burden, the plaintiff must then prove that 'retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.'"  <u>Shellenberger v. Summit Bancorp, Inc.</u>, 318 F.3d 183 (3d Cir. 2003) (quoting <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500 (3d Cir. 1997)).

Defendants argue that Plaintiff's retaliation claims are unsupported because she has failed to establish in the record both what type of "protected activity" she claims to have engaged in, and any evidence of a causal link between the alleged protected activity and her employment termination.  Def.s' Br. at 10-11.  Plaintiff responds that the record does establish her retaliation claim because there is sufficient evidence to permit a reasonable jury to find a causal link between her requesting accommodation for her disabilities and exercising her FMLA rights, and her wrongful termination from her employment with Penn.  Pl.'s Br. at 17.

Plaintiff's argumentation is inattentive to the first requirement of establishing a prima facie retaliation case, which on the record evidence she cannot satisfy.  The actions of requesting accommodation for disabilities and exercising FMLA rights both reflect an attempt to take advantage of the benefits and rights guaranteed by the ADA; neither of these constitutes opposing conduct made unlawful by it.  Plaintiff points to two actions in particular—her working

in the Unit clerk position, a position that is offered as accommodation to PCT's who are on modified duty due to disability, and her use of Intermittent FMLA. Pl.s' Br. at 16-18. Both are examples of exercising ADA protected rights, and cannot be properly characterized as opposition to Defendants' violation of her or another individual's ADA rights. There is no evidence in the record that Plaintiff did anything at all to oppose actions by Defendants that violate the ADA— such as filing a grievance or making any sort of formal or informal complaint concerning the denial of ADA rights—during the relevant time period.

Because Plaintiff cannot make out a prima facie retaliation case, there is no need for this Court to engage in burden shifting analysis on these claims. Summary judgment will be granted in favor of Defendants on Counts II, V, and VIII.

### C. Count III: FMLA Claims

Count III alleges retaliation and interference under the FMLA. The FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA regime. 29 U.S.C. § 2615(a)(1). This section provides the source for FMLA "interference" claims. It is also unlawful under the FMLA for an employer "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. § 2615(a)(2). This section provides the source for FMLA "retaliation" claims. "Although neither provision expressly forbids employers from terminating employees 'for having exercised or attempted to exercise FMLA rights,' a Department of Labor regulation has interpreted the sum of the two provision as mandating this result." Lichtenstein v. University of Pittsburgh Medical Center, 691 F.3d 294, 301 (3d Cir. 2012).

"To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Id. at 301-02. FMLA retaliation claims are "assessed [ ] through the lens of employment discrimination law," that is, under the McDonnell Douglas framework. Id. at 302. Our analysis of Plaintiff's FMLA retaliation claim tracks almost perfectly our analysis of her discrimination claims, and like her discrimination claims it must fail. The record clearly establishes the first two prongs of Plaintiff's prima facie FMLA retaliation claim—she invoked her right to FMLA-qualifying leave, and she was terminated from her position as a PCT—however the causation prong is equally difficult to prove here as it is for Plaintiff in the discrimination context, as it implicates all of the same evidence and considerations. Assuming again that a jury could reasonably conclude that Plaintiff has made out a prima facie FMLA retaliation claim, however, the same burden shifting analysis that was done in relation to her discrimination claims likewise dooms this claim. There is simply not evidence in the record that genuinely calls into question Defendants' explanation that Plaintiff was fired due to progressive disciplinary issues.

Plaintiff offers one new argument in support of her FMLA retaliation claim, urging that Defendant Ball made the decision to terminate Plaintiff despite her having already been approved for FMLA leave. Pl.'s Br. at 18-20. This speaks only to the order of events, and without additional evidence is insufficient to establish that the decision to fire Plaintiff was motivated by her taking FMLA leave, rather than her well documented, progressive disciplinary issues. There is no genuine issue of fact as to whether Defendants fired Plaintiff because of her exercise of FMLA rights, and no reasonable jury could conclude that she was.

We turn next to Plaintiff's interference claim. "An interference claim is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Callison v. City of Philadelphia, 430 F.3d 117, 120 (3d Cir. 2005). In order to be a successful on an interference claim, then, a plaintiff must simply show that (1) she was entitled to an FMLA benefit, and (2) her employer denied her right to that benefit. Lichtenstein, 691 F.3d at 312 (citing Callison, 430 F.3d at 119). This Plaintiff plainly cannot do. Defendants correctly argue that Plaintiff was not denied any benefit to which she was entitled under the FMLA. Def.'s Br. at 18-19. The record establishes that Plaintiff was granted Intermittent FMLA leave for "Serious Health Condition—Self" and that she took advantage of that leave. There is no evidence that Defendants prevented her in any way from doing so. Then, in December, 2015, Plaintiff applied for, and was granted, continuous FMLA leave for three months. Again, she took advantage of that leave, and there is no evidence that Defendants prevented her in any way from doing so. Defendant Ball texted Plaintiff the week that her FMLA leave was ending in order to add Plaintiff to the work schedule. As Defendants correctly argue, Defendant Ball's texts were simply a lawful attempt to add Plaintiff to the work schedule upon her return from leave. Def.s' Br. at 19-20. Far from interfere with Plaintiff's FMLA benefits, by texting Plaintiff to add her to the schedule after her continuous leave ran out, Defendant Ball was respecting those benefits and respecting Plaintiff's right to return to work following continuous leave.

Summary judgment will be granted in favor of Defendants on Count III.

### D. Count IX: PFPO Aiding and Abetting Claim

As Plaintiff has failed to establish any of her claims under the PFPO, her claim that Defendants aided and abetted PFPO violations too must fail. Summary judgment will be granted in Defendants' favor on Count IX.

## V. ORAL ARGUMENT

On September 13, 2018 the Court held oral argument on Defendants' Motion for Summary Judgment after posing some questions to counsel for both Plaintiff and Defendants. While Plaintiff's Counsel conceded that Plaintiff was "not a model employee" prior to 2015, Counsel argued that the temporal proximity between the email sent to Defendant Ball on February 9, 2015 indicating that Plaintiff was approved for Intermittent FMLA leave, and the Coaching that Plaintiff received that same day, is evidence that Defendants were disciplining Plaintiff in response to her taking leave. Plaintiff's Counsel pointed to Carvalho-Grevious v. Delaware State University, 851 F.3d 249 (3d Cir. 2017) in support of his position that a lengthy history of performance issues during which time a Plaintiff was not terminated from employment, predating a time period of similar performance issues that did lead to termination from employment, can lead a reasonable factfinder to infer that the decision to terminate was based on a discriminatory motive and that claiming the decision was due to the Plaintiff's poor performance may be a pretext. Plaintiff did experience negative performance feedback prior to 2015, however the evidence suggests that patient complaints about her conduct increased during that year. Moreover, in Carvalho-Grevious v. Delaware State University, the Defendant employer withheld from the Plaintiff employee opportunities for performance improvement that were routinely offered to employees experiencing disciplinary issues. Carvalho-Grevious v. Delaware State University, 851 F.3d at 262-63. The Third Circuit reasoned that a factfinder

could infer therefrom that the employer's explanation that the Plaintiff was fired for her poor performance was simply a pretext. There is no evidence of that sort in this case.

Defense Counsel recounted details of the factual record during argument, including that Plaintiff's poor performance is well corroborated by documentation and testimony, and that Plaintiff herself admitted to some of the conduct underlying the disciplinary write-ups she received. Plaintiff's Counsel conceded that this description of the record is accurate. Defense Counsel pointed to <u>Willmore v. American Atelier, Inc.</u>, 72 F.Supp.2d 526 (E.D. Pa. Nov. 24, 1999) in support of the contention that a well-documented and corroborated record of poor performance by an employee, faced with no evidence to refute that record, is a sufficient basis on which to conclude that an employer had a legitimate, nondiscriminatory reason to terminate a Plaintiff's employment, and that those reasons are not a pretext for discrimination. We agree. Plaintiff has not demonstrated causation, and even assuming that she has, the Defendants have put forth significant and undisputed evidence of the nondiscriminatory reasons for which they terminated her employment, and Plaintiff has not shown pretext of the quantity or quality required by Third Circuit precedent.

## VI. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 28) is granted in full.